## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ROBERT MARRIOT MEDICAL CORP. D/B/A ADVANTAGE WOUND CARE, INC.,** | : | **CIVIL ACTION NO.:** |
| | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **JUDGE:** |
| | : | |
| **VERSUS** | : | |
| | : | |
| **WELLSPRING WOUND CARE, LLC, CHAD BAILEY, AND RACHAEL BAILEY** | : | **MAGISTRATE:** |
| | : | |
| | : | |
| **Defendants** | : | |

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, Robert Marriot Medical Corp. d/b/a Advantage Wound Care, Inc. ("**Advantage**"), files this *Complaint for Damages and Injunctive Relief*. This action primarily arises out of the misuse of Advantage's confidential business information by Defendants, Chad Bailey ("**Mr. Bailey**") and Rachael Bailey ("**Mrs. Bailey**") (collectively, "the **Baileys**"), as well as their successful efforts to divert business from Advantage, while still in its employ, for the benefit of themselves and their new employer, Defendant Wellspring Wound Care, LLC ("**Wellspring**"). Advantage seeks damages and injunctive relief for breaches of duty of loyalty, breach of contract, conversion, a violation under the Louisiana Unfair Trade Practices Act, La. R.S. § 51:1401 *et seq.*, a violation of the Computer Fraud and Abuse Act, § 18 U.S.C. 1030 *et seq.*, unjust enrichment, and for civil conspiracy.

### PRELIMINARY STATEMENT

Advantage unknowingly had two foxes in its henhouse. Two of its former trusted employees—who had access to Advantage's entire computer network—misappropriated Advantage's confidential information. They misused Advantage's protected information to start a

1

competing wound care services division and strategically poach Advantage's contracted facilities, including by actively working—and conspiring—to surreptitiously divert business from Advantage, for their own and Wellspring's benefit, while still in Advantage's employ.

## PARTIES

1.

Robert Marriott Medical Corp. (doing business as Advantage Surgical and Wound Care) is a California company that maintains its principal place of business at 222 N Pacific Coast Hwy, Suite 2175, El Segundo, CA 90245, and is registered to do business in Louisiana.

2.

Wellspring Wound Care, LLC[1] is a Louisiana limited liability company that maintains its principal place of business at 913 S. College Drive, Suite 216, Lafayette, LA 70503.

3.

Chad Bailey is an individual who is domiciled and resides in Lafayette, Louisiana.

4.

Rachael Bailey is an individual who is domiciled and resides in Lafayette, Louisiana.

## JURISDICTION AND VENUE

5.

Jurisdiction is proper under 28 U.S.C. § 1332. The Court also has jurisdiction over Advantage's state laws claim under 28 U.S.C. § 1367 and 28 U.S.C. § 1332.

---

[1] The Louisiana Secretary of State's website identifies several different entities with the name Wellspring Wound Care, each of which has a corporate name that varies slightly.  Upon information and belief, Advantage has identified the correct entity.

#104014311v1

6.

Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this litigation occurred in the jurisdiction of the Western District of Louisiana.

7.

Advantage is completely diverse from the Baileys and Wellspring. Further, the amount in controversy exceeds $75,000.00. Because of the wrongful conduct alleged herein, Advantage's lost profits to date already exceed $75,000.00, and the diminution in the value of its business likewise already exceeds $75,000.00 considering the future lost profits it would likely have received but for the wrongful conduct alleged herein. In addition, Advantage's legal fees have exceeded or will exceed $75,000.00, and those fees are considered to establish the amount in controversy because they are recoverable by statute under the Louisiana Unfair Trade Practice Act, La. R.S. § 51:1401 *et seq.*

**FACTUAL BACKGROUND**

***The Baileys and Their Employment***

8.

Advantage provides comprehensive wound care services to patients residing in congregate health care facilities such as skilled nursing facilities, assisted living facilities, and rehabilitation centers, including surgical care for wound issues, and is authorized to do business in the State of Louisiana.  It accesses these patients through service agreements with contracted facilities.

9.

Mr. Bailey worked for Advantage as an independent contractor offering Nurse Practitioner's services in Louisiana from January 26, 2016, until Mr. Bailey became an employee of Advantage on December 16, 2021.

3

10.

Mrs. Bailey worked for Advantage as an independent contractor offering Nurse Practitioner's services in Louisiana from February 19, 2018, until Mrs. Bailey became an employee of Advantage on December 16, 2021.

11.

During his work for Advantage as an independent contractor, Mr. Bailey had a clearly established pool of Advantage customers for whom he provided services, and the geographic location of the customers whom he serviced on behalf of Advantage was clearly defined and known to him.

12.

During her work for Advantage as an independent contractor, Mrs. Bailey likewise had a clearly established pool of Advantage customers for whom she provided services, and the geographic location of the customers whom she serviced on behalf of Advantage was clearly known to her.

13.

Identical to his duties as an independent contractor, Advantage hired Mr. Bailey as a Nurse Practitioner employee whose primary job duty was to interface with the same existing contracted facilities, at the same geographic locations.

14.

Identical to her duties as an independent contractor, Advantage hired Mrs. Bailey as a Nurse Practitioner employee whose primary job duty was to interface with the same existing contracted facilities, at the same geographic locations.

#104014311v1

***Advantage's Computer/ Mobile Security/ Document Policy***

15.

On February 4, 2016, Mr. Bailey signed an acknowledgement of Advantage's Computer/

Mobile Security/ Document Policy (the "Computer Policy"). (**Exhibit 1**).

16.

On March 5, 2018, Mrs. Bailey signed an acknowledgement of Advantage's Computer

Policy. (**Exhibit 2**).

17.

The Computer Policy contains the following email management provision:

Email Management

> Emails involving sensitive information (i.e. patient information)
> should be performed within the corporate server.  Sharing sensitive
> information over non-secure/ free email sites (Yahoo, Google,
> Hotmail, AOL, etc.) is prohibited.  Emails should not be forwarded
> or copied to persons who are not authorized to receive sensitive
> information.

(**Exhibits 1 and 2**).

18.

The Computer Policy also contains the following provision which requires employees and

subcontractors to report unauthorized use or disclosure of protected health information ("PHI"):

Reporting Unauthorized Disclosure of PHI

> Employees and Subcontractors are required to report any
> unauthorized use or disclosure of PHI of which they become aware
> immediately.

(**Exhibits 1 and 2**).

#104014311v1

*Advantage's Compliance Manual*

19.

On February 6, 2016, Mr. Bailey signed an acknowledgement of Advantage's Compliance Program and Manual (the "Manual"). (**Exhibit 3**).

20.

On March 5, 2018, and on September 20, 2019, Mrs. Bailey signed an acknowledgement of Advantage's Compliance Program and Manual. (**Exhibits 4 and 5**).

21.

The Manual contains the following confidentiality provision regarding patient information and records:

> Maintain the Confidentiality of Patient Information and Records
>
> The practice collects and maintains patient information that is protected by federal and state regulations. Whether in verbal, printed, or electronic form, it is the responsibility of all employees to safeguard patient information as specified by HIPAA regulations as well as the privacy and security policies of the practice. Any unauthorized disclosure of patient information may subject you to civil and criminal prosecution, as well as termination from employment. Employee responsibility for maintaining the confidentiality of patient information shall continue beyond the employee's term of employment with the practice.

(**Exhibits 3 and 4**).

*Advantage's HIPAA Agreement*

22.

On February 6, 2016, Mr. Bailey entered into a HIPAA Agreement with Advantage. (**Exhibit 6**).

6

23.

On March 5, 2018, Mrs. Bailey likewise entered into a HIPAA Agreement with Advantage.

(**Exhibit 7**).

24.

The Baileys' respective HIPAA Agreements with Advantage contain the following

identical confidentiality provisions whereby the Baileys agreed not to disclose confidential

information, including Protected Health Information ("PHI"):

Confidential Information

Any information in whatever form that concerns Business
Associates' business, its clients or business partners, or that it
provides to or generates for its clients or business partners shall be
regarded as Confidential Information and shall not be disclosed by
Subcontractor/Employee during the term of this Agreement or after
this Agreement terminates to any person not acting on behalf of
Business Associate without Business Associate's written consent.
Upon termination of this Agreement, Subcontractor shall return to
Business Associate all Confidential Information and any other
property of Business Associate provided or made available to
Subcontractor.

Confidentiality of PHI

Subcontractor shall not use or disclose PHI in any manner that
would constitute a violation of HIPAA by a Covered Entity.
Subcontractor/ Employee shall not disclose PHI to a person or entity
other than Business Associate. Subcontractor shall only use or
disclose PHI when: (i) permitted or required by this Agreement; (ii)
Required by Law; (iii) specifically authorized by Covered Entity or
Business Associate; (iv) necessary for the proper management and
administration of Subcontractor; and (v) necessary to perform the
Services.

(**Exhibits 6 and 7**).

7

25.

Concerning the aforementioned provisions, the Baileys also agreed to return or destroy all PHI in their possession that was created for or received from Advantage upon the termination of their employment:

### Term and Termination

> This Agreement shall remain in effect as long as Subcontractor /Employee provides the Services. Upon termination, Subcontractor shall return or destroy all PHI in its possession that was created for or received from Covered Entity or Business Associate. If it is infeasible to return or destroy the PHI, then Subcontractor shall continue to extend the protections of this Agreement to such information and limit further use of such PHI to those purposes that make the return or destruction of such PHI infeasible. Subcontractor agrees that it will not retain any copies of PHI in any form or medium except as Required by Law.

(**Exhibits 6 and 7**).

### *Advantage's Business Associate Agreement*

26.

On February 6, 2016, Mr. Bailey entered into a Business Associate Agreement ("BA Agreement") with Advantage. (**Exhibit 8**).

27.

On March 5, 2018, Mrs. Bailey likewise entered into a BA Agreement with Advantage. (**Exhibit 9**).

28.

The Baileys' respective BA Agreements with Advantage contain the following identical provisions regarding the effect of termination:

8

<u>Effect of Termination</u>

> Except as provided below in paragraph 4(c)(2) of this BA Agreement, upon termination of this Agreement, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate.

> Business Associate shall retain no copies of the Protected Health Information.

(**Exhibits 8 and 9**).

***The Employment Agreement and Its Restrictive Covenants***

29.

On December 16, 2021, Mr. Bailey entered into an Employment Agreement with Advantage, transitioning from an independent contractor to an employee.  (**Exhibit 10**).

30.

On December 16, 2021, Mrs. Bailey entered into an Employment Agreement with Advantage, transitioning from an independent contractor to an employee.  (**Exhibit 11**).

31.

The Baileys' respective Employment Agreements with Advantage contain the following identical proprietary information provision whereby the Baileys agreed not to disclose Advantage's "Confidential Information" and "Trade Secrets":

<u>Proprietary Information</u>

> Nurse practitioner agrees to keep this Agreement and the terms and conditions herein strictly confidential. During the Term, Nurse practitioner may have access to and become acquainted with Confidential Information and Trade Secrets. All Trade Secrets are the exclusive property of Corporation and constitute proprietary information protected under the Uniform Trade Secrets Act and other applicable law.  Nurse practitioner shall not disclose any Trade

#104014311v1

Secrets of Corporation to any person or entity, either directly or indirectly, either during the Term or at any time thereafter, or use any Trade Secrets other than as necessary in the course of providing Services under this Agreement.

(**Exhibits 10 and 11**).

32.

Consistent with these obligations, the Baileys also agreed to return Advantage's property and sensitive information, including medical records and patient lists, upon the termination of their employment:

Documents

All notes, memoranda, files, records, software, writings and other documents, of a business or medical nature, or otherwise, which Nurse practitioner shall prepare, use or come into contact with during the term of this Agreement which relate to or are useful in any manner to the business now or hereafter conducted by Corporation are and shall remain the sole and exclusive property of Corporation. Nurse practitioner shall not remove from any premises the original or any reproduction of any such material nor the information contained therein without the prior written consent of Corporation and all such medical records, patient lists, material and information in Nurse practitioner's possession or under Nurse practitioner's custody or control shall be immediately turned over to Corporation upon the termination of this Agreement for any reason and/or at any time whenever requested by Corporation.

(**Exhibits 10 and 11**).

33.

The Employment Agreements also contain the following non-solicitation provision that limits the Baileys' ability to compete against Advantage with respect to soliciting business from existing patients, clients, or facilities contracted with Advantage and with respect to inducing existing patients, clients, or facilities to terminate their relationship with Advantage:

<u>Restrictive Covenants</u>

> Nurse practitioner agrees that, in consideration of the promises contained herein and the consideration to be received by Nurse practitioner pursuant to this Agreement, the receipt and sufficiency of which are hereby acknowledged, during the Term and the two (2) year period following the termination of this Agreement (together, the "Restricted Period"), Nurse practitioner shall not (and shall not attempt to), directly or indirectly (including, but not limited to, by action in concert with others), either for him or herself or for any other person, (i) call on or solicit, any existing patients, clients, including any facility contracted with Corporation or affiliates of Corporation (each, a "Client") for the purpose of providing, selling or recommending any services within long-term care, skilled nursing, or any other facilities which are in direct or indirect competition with or similar to business products or services of Corporation in the United States, including, but not limited to, wound care arrangements and/or contracts with long-term care, skilled nursing, or any other facilities ("Competitive Services"), or (ii) otherwise attempt to induce or cause any such Client to terminate, amend, modify or reduce such Client's relationship with Corporation.

(**Exhibits 10 and 11**).

34.

At the time the Baileys and Advantage executed the Employment Agreements, the Baileys were aware that their job duties—including the client contracted facility locations wherein they would provide services on behalf of Advantage—would continue to be the same after they became Advantage employees, and, accordingly, the parties intended in the above provision to narrowly restrict the Baileys' ability to solicit customers (for a competing business and only for customers with whom they had material contact) at those well-known and clearly established locations.

35.

Consistent with these obligations, the Baileys agreed not to provide medical services, contract with, affiliate with or otherwise provide clinical, management, administrative or consulting services to any clients or facilities with whom they had material contact:

#104014311v1

<u>Restrictive Covenants</u>

> During the Restricted Period, Nurse practitioner covenants and agrees that Nurse practitioner shall not, without the prior consent of Corporation (which consent may be withheld in Corporation's sole and absolute discretion), directly or indirectly, either individually or as a partner, joint venture, employee, agent, representative, officer, director, member or member of any Person, (i) provide medical services within Nurse practitioner's specialty at any of the Clients for which Nurse practitioner has provided any of the Services during the Term; or (ii) contract with, affiliate with or otherwise provide clinical, management, administrative or consulting services at any Clients for which Nurse practitioner has provided any management, administrative or consulting services or any of the Services during the Term. Notwithstanding anything to the foregoing, Nurse practitioner may provide medical services within Nurse practitioner's specialty to an individual patient who specifically requests his/her services.

(**Exhibits 10 and 11**).

36.

The Baileys specifically acknowledged in the Employment Agreements that these provisions were reasonable and necessary to protect Advantage's business, operations, intellectual property, Confidential Information, Trade Secrets, and goodwill:

> Nurse practitioner expressly declares that the provisions of this Agreement, including this <u>Section 8</u>, are entirely reasonable at this time and are properly and necessarily required for the adequate protection of the business, operations, intellectual property, Confidential Information, Trade Secrets and goodwill of Corporation.

(**Exhibits 10 and 11**).

37.

The Employment Agreements also contain the following provisions whereby the parties agreed that, to the extent the foregoing provisions are deemed unenforceable, they must be reformed to remain enforceable to the fullest extent deemed reasonable:

12

Restrictive Covenants

It is the desire and intent of the Parties that the provisions of this Section 8 shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If any particular provisions of this Section 8, including without limitation any territorial or time limitations contained in this Section 8, shall be adjudicated to be invalid or unenforceable, whether due to passage of time, change of circumstances, or otherwise, the provisions of this Section 8 shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, or to reduce said territorial or time limitations to such areas or periods of time as said court shall deem reasonable, such deletion or reduction to apply only with respect to the operation of this Section 8 in the particular jurisdiction in which such adjudication is made.

Severability

The provisions of this Agreement are independent of and distinct and severable from each other, and no provision shall be held to be invalid or unenforceable by virtue of the fact that any other provision may be held to be illegal, against public policy or unenforceable in whole or in part.

(**Exhibits 10 and 11**).

### *Mr. Bailey and Mrs. Bailey are Assigned the Same Customers and Territory*

38.

Before he became employed by Advantage, Mr. Bailey communicated with Advantage's Regional Manager in Louisiana, Byron Coston, for the exact purpose of discussing both the specific facilities for whom, and the specific parishes in which, he would provide services on behalf of Advantage.  As indicated above, Mr. Bailey's assignment mirrored what he was doing —and had been doing for approximately six years—on behalf of Advantage as an independent contractor.  Specifically, Mr. Bailey was instructed to continue providing wound care services at contracted facilities on behalf of Advantage in the following parishes:  Lafayette Parish, Acadia

13

Parish, Vermilion Parish, Jefferson Davis Parish, St. Martin Parish, Calcasieu Parish, Caddo Parish, Terrebonne Parish, and Iberia Parish.

39.

Before she became employed by Advantage, Mrs. Bailey communicated with Advantage's Regional Manager in Louisiana, Byron Coston, for the exact purpose of discussing both the specific facilities for whom, and the specific parishes in which, she would provide services on behalf of Advantage. As indicated above, Mrs. Bailey's assignment mirrored what she was doing—and had been doing for approximately four years—on behalf of Advantage as an independent contractor. Specifically, during this meeting, Mrs. Bailey was assigned the following parishes in which she was to continue providing wound care services to contracted facilities on behalf of Advantage: Lafayette Parish, Acadia Parish, Vermilion Parish, Jefferson Davis Parish, St. Martin Parish, Calcasieu Parish, Caddo Parish, Terrebonne Parish, and Iberia Parish.

### *Advantage's Computing Systems and The Protected Information Stored on It*

40.

To perform their job duties, Advantage gave the Baileys access to its computing systems, on which Advantage stores confidential business information. This access included Advantage's email servers and Advantage's Electronic Medical Record system, which housed confidential pricing information, confidential patient, client, and facility information, as well as other confidential business information concerning the patients and facilities whom the Baileys serviced on behalf of Advantage in their assigned sales territory.

14

***Unexpected Departures and Unlawful Competition***

41.

On June 17, 2024, Mrs. Bailey resigned from Advantage. Advantage has since learned that she left to become employed by Wellspring Wound Care, LLC ("**Wellspring**") to create a wound care division that would be Advantage's direct competitor in the Louisiana parishes wherein Mrs. Bailey performed services on behalf of Advantage. At Wellspring, Mrs. Bailey performed the same job duties and services on behalf of Wellspring that she provided while she was an independent contractor and employee for Advantage.

42.

Meanwhile, Mr. Bailey remained an Advantage employee and did not disclose to Advantage that his wife was starting a competing business, and then poaching the very same Advantage customers whom she and Mr. Bailey provided services on behalf of Advantage. Around three months later, on September 26, 2024, Mr. Bailey resigned. Advantage has since learned that he, too, left to become employed by Wellspring and join Mrs. Bailey there.

43.

To date, Advantage has lost twenty-six customers—all of whom were assigned to, and serviced by, the Baileys—to Wellspring since the Baileys' separations and because of the wrongful conduct alleged herein.

***Advantage's Internal Audit Uncovers Alarming Activity***

44.

Advantage initiated an internal audit of its computer systems to determine whether—and to what extent—any unlawful conduct had occurred or was ongoing, particularly considering Mrs.

Bailey resigned to start a direct competitor and poach Advantage's customers, all the while Mr. Bailey remained employed by Advantage but concealed this fact in violation of his duty of loyalty.

45.

During this early internal audit, Advantage learned that Mrs. Bailey was secretly accessing on multiple occasions, without authorization, Advantage's protected email servers after her resignation, even though she was no longer employed by Advantage. That access allowed her to see virtually everything she was able to see while she was an Advantage employee, including: patient records, facility lists, and a teams directory.

46.

Advantage learned that Mr. Bailey was sending Advantage patient lists to Mrs. Bailey while he was still an Advantage employee, but she was a Wellspring employee. These lists contained confidential information and protected health information including patient names, dates of service, and CPT codes.

47.

Advantage also learned that after Mrs. Bailey's resignation and while Mr. Bailey was still an Advantage employee, on August 4, 2024, Mr. Bailey sent an email from his personal yahoo email account to Mrs. Bailey's personal yahoo email account with the subject line "charge audit." The email contained an excel attachment entitled "WELLSPRING_ChargeAudit_072024 (1)" listing Advantage patient names, dates of service and CPT codes. Later that same day, Mrs. Bailey forwarded this message and attachment from her personal yahoo email account to her Advantage email account.

#104014311v1

48.

Advantage also discovered that Mr. Bailey was secretly accessing on multiple occasions, without authorization, Advantage's protected email servers and had access to Advantage's Electronic Medical Record system following his separation. That access allowed him to see everything he was able to see while he was an Advantage employee, including: patient records, facility lists, and a teams directory.

49.

Upon information and belief, Wellspring, with the help of the Baileys, has used Advantage's confidential business information to unfairly go after and/or continue to service Advantage's clients for the Baileys' and Wellspring's own benefit and to Advantage's detriment.

***The Pre-Suit Protocol Uncovers Substantial Evidence of Wrongdoing***

50.

Because litigation appeared likely, prior to this lawsuit's filing, the Baileys and Advantage entered a forensic protocol agreement to allow an independent, third-party forensic examination of the Baileys' cell phones, as the Baileys remained confident that they did not engage in unlawful conduct, and, as such, results of the protocol would allay Advantage's concerns and discourage Advantage from filing this lawsuit.

51.

The Bailey's confidence appeared grounded in their position that the non-competition provisions in their Employment Agreements are invalid because, inadvertently, they do not enumerate parishes and/or counties wherein competition is restricted (even though the Baileys knew exactly what clients they were assigned and exactly where those clients were located).

17

52.

But the Baileys' confidence was misplaced—that is, even if the non-competition provisions in the their Employment Agreements are invalid (something the parties dispute), that (disputed) fact does not exonerate them from other pre-separation (or post-separation) wrongdoing uncovered through the Protocol, which ultimately yielded evidence establishing that the Baileys breached their duties of loyalty to Advantage and engaged in unfair trade practices by engaging in disloyal, self-dealing conduct that went far beyond mere preparation to compete. Consider the following examples of misconduct discovered through the Protocol:

- On May 29, 2024, three weeks before her separation from Advantage, Mrs. Bailey sent two text messages to different Advantage clients stating: ". . . I wanted to give you a heads up I put my 2 weeks notice in with [A]dvantage to pursue an opportunity that came up. I will still be doing rounds there the next 2 weeks like normal and my number won't change. [B]ut just wanted to give you a heads up."

  *By saying "my number won't change," this text went beyond informing a client about an upcoming separation, and this text instead was an overt solicitation of business while Mrs. Bailey was still employed by Advantage.*

- On May 31, 2024, again around three weeks before her separation from Advantage, Mrs. Bailey sent two text messages to different Advantage clients stating: "Hey! I just wanted to give you a heads up[.] I put in my 2 week notice in with [A]dvantage to pursue an opportunity that came up. I will still be doing rounds there for the next additional 2 weeks like normal. Katelyn is working on finding someone to take my place and will let you know asap. [M]y number won't change, y'all can always reach out, but just wanted to give you a heads up."

  *By saying "my number won't change," this text went beyond informing a client about an upcoming separation, and this text instead was an overt solicitation of business while Mrs. Bailey was still employed by Advantage.*

#104014311v1

- On June 6, 2024, over three months before his separation, Mr. Bailey sent a text: "To hire people for my new company. But you can't say anything about it yet[.]"

  *This text suggests Mr. Bailey was recruiting key talent for his new venture instead of bringing the opportunity of hiring them to Advantage.*

- On June 12, 2024, five days before her separation from Advantage, Mrs. Bailey texted a group, which included Mr. Bailey: "I'm telling everybody they can reach out to me on Tuesday and I can update them on my latest venture, I hope y'all have something for me to tell them. And like a contact person I can send them to if they ask for one."

  *This text establishes that Mrs. Bailey was soliciting clients to follow her to her new employer while still employed by Advantage, and she was working with Mr. Bailey in this regard while he, too, was still employed by Advantage.*

- On July 30, 2024, a month before his separation, Mr. Bailey sent a text: "Please add [M]ontez [C]redeur to your list got verbal consent."

  *This text suggests Mr. Bailey signed Montez Credeur up as a new client for his new venture while still employed by Advantage.*

- On August 26, 2024, a month before his separation, Mr. Bailey sends a text: "Hey bud, Can just say you know someone that does wound care in the nursing home and if they have a need we can reach out. Thanks[.]."

  *This text suggests Mr. Bailey was actively soliciting work for his new venture while still employed by Advantage.*

- On September 4, 2024, almost a month before his separation, Mr. Bailey receives a text: "Morning! I heard you were leaving. Is that your wound care company or just GH? I will surely miss you!"

  *This text suggests that Mr. Bailey was soliciting business for his new employment while still employed by Advantage.*

19

53.

Discovery will shed light on the foregoing communications—and other troubling communications—that establish the Baileys actively diverted business opportunities, to enrich themselves and Wellspring, while still being paid as Advantage employees, and that they were using Advantage's confidential patient information to secure and/or continue to work for the Advantage clients that they unfairly poached.

54.

Wellspring has knowingly accepted benefits from the Baileys' wrongful conduct, and, on information and belief, Wellspring encouraged and assisted the Baileys' in their efforts to improperly poach Advantages' clients while one or both Baileys were still employed by Advantage.

55.

The Baileys and Wellspring actively concealed their wrongful conduct from Advantage, and their wrongful conduct constitutes a continuing tort—*i.e.*, their unlawful competition continued for the period leading up to and after the Baileys' eventual separations from Advantage, and they continue to service Advantage's former clients that were successfully poached through unlawful means.

**COUNT ONE**
***Breach of Contract for Violation of the Employment Agreements'***
***Return of Property and Non-Disclosure Provisions***
**(Against the Baileys)**

56.

Advantage incorporates herein by reference the previous allegations.

#104014311v1

57.

At the beginning of their employment with Advantage, and as a condition of their employment with Advantage, the Baileys voluntarily agreed to the terms of the Employment Agreements, including the aforementioned restrictive covenants, which required them to return company property, and, separately, which the parties intended to restrict the Baileys' ability to solicit customers, and, as described above, restrict their ability to use Advantage's confidential information. Advantage has, at all relevant times, complied with its obligations to the Baileys under the terms of their employment, including paying their agreed upon compensation and benefits, as well as providing them with access to its customers and confidential information.

58.

The Baileys breached the Employment Agreements by failing to return confidential information belonging to Advantage, including HIPAA protected information and Advantage's confidential pricing and facility and patient contact information, some which, on August 4, 2024, while he was still an employee of Advantage, Mr. Bailey improperly emailed to Mrs. Bailey's personal email account (rnl9497@yahoo.com) in violation of company policy. At this time, Mr. Bailey already knew that Mrs. Bailey was employed by a direct competitor, but he concealed this fact from Advantage to benefit Mrs. Bailey, himself, and Wellspring.

59.

The Baileys have likewise breached their Employment Agreements by using and/or disclosing Advantage's confidential business information to benefit themselves and/or their new employer in direct competition against Advantage. This includes using and disclosing Advantage's confidential information to compete against Advantage for the benefit of themselves and

Wellspring and to solicit and induce customers of Advantage to transfer their business away from Advantage and to Wellspring.

60.

Advantage took reasonable steps to maintain the secrecy of the misappropriated information, namely, information on its computing systems, by limiting its dissemination and by expressly advising its employees, including the Baileys, that such information is confidential and not to be disclosed for any purpose other than authorized business for Advantage's benefit. Advantage also required the Baileys to enter into agreements acknowledging the confidentiality of its information and to return its confidential information at the end of their employment.

61.

Misappropriation of Advantage's confidential information has benefited the Baileys and allowed Wellspring to start and ramp up operations without having to, *inter alia*, make substantial and otherwise unavoidable upfront investment in marketing and customer acquisition.

62.

Such conduct represents a material breach of the agreements the Baileys entered with Advantage and, by disrupting Advantage's customer relationships and providing themselves and/or their new employer with an unfair and unjust competitive advantage, the Baileys have caused and will continue to cause damages to Advantage in the form of lost revenue, diminution in value of its business, and other damages. Further, the foregoing unfair and anti-competitive conduct establishes "bad faith" that entitles Advantage to both foreseeable and unforeseeable damages for breach of contract.

## COUNT TWO
### Breach of Duty of Loyalty (Against the Baileys) and
### Aiding and Abetting Breach of Duty of Loyalty (Against Wellspring)

63.

Advantage incorporates herein by reference the previous allegations.

64.

The Baileys, as licensed Nurse Practitioners with long-standing relationships with Advantage, were highly trusted employees with significant responsibilities for Advantage, and, as such, they owed common law duties to Advantage including duties of loyalty and fair dealing.

65.

Nevertheless, the Baileys, prior to and after their resignations from Advantage—and in violation of their Employment Agreements and their statutory and common law duties—accessed and used confidential information from their Advantage email accounts and Advantage's document retention platform, without authorization, to benefit themselves and Wellspring to Advantage's detriment.

66.

Further, while still employed by Advantage, the Baileys actively solicited customers and took measures—beyond simply preparing to compete—to divert business opportunities from Advantage (to Advantage's obvious detriment) for their own and Wellspring's benefit.

67.

Mrs. Bailey, for her part, concealed her plan to leave Advantage to establish a competing wound care division at Wellspring, and she began diverting business opportunities away from Advantage and to Wellspring. During that time, Mr. Bailey, for his part, remained an Advantage employee and did not disclose to Advantage that his wife was starting a competing business and

#104014311v1

poaching the very same Advantage customers whom she and Mr. Bailey provided services on behalf of Advantage.

68.

In addition to his silence in the face of a duty to speak, Mr. Bailey, moreover, actively assisted Mrs. Bailey in diverting business away from Advantage while he was still employed by Advantage, including by providing her with confidential information related to Advantage's business and customers. Mr. Bailey also solicited business for himself, Ms. Bailey, and/or Wellspring while still employed by Advantage.

69.

Wellspring induced the Baileys to breach their duty of loyalty by recruiting them to perform the foregoing acts, by knowingly hiring them notwithstanding the foregoing acts, and by knowingly benefiting from the foregoing acts.

70.

The Baileys knowingly and intentionally—with the intent to benefit themselves at Advantage's expense and at Wellspring's direction and/or with Wellspring's knowledge and encouragement—breached their duties of loyalty and fair dealing to Advantage, and Advantage has sustained damages because of their actions. Accordingly, Advantage seeks damages from the Baileys and Wellspring for the Baileys' breach of their duties to Advantage.

**<u>COUNT THREE</u>**
***Violation of the Louisiana Unfair Trade Practices Act ("LUTPA")***
**(Against All Defendants)**

71.

Advantage incorporates herein by reference the previous allegations.

72.

24

LUTPA prohibits unfair trade practices, which involve some element of fraud, misrepresentation, deception, or other unethical conduct.

73.

The Baileys and Wellspring have engaged in false, misleading, and deceptive practices in their unlawful competition with Advantage.

74.

Specifically, the Baileys and Wellspring have used and/or continue to use Advantage's misappropriated confidential information and have sabotaged Advantage's customer relationships, including by the Baileys' pre-separation breaches of their duty of loyalty.

75.

The Baileys carried out their misappropriation of confidential information by breaching their duty of loyalty to Advantage, including by misleading Advantage about their post-employment plans and by secretly accessing, without authorization, Advantage's email servers after one or both of their resignations, and they used and/or continue to use this misappropriated information to sabotage Advantage's customer relationships and/or divert business away from Advantage. In addition, the Baileys actively diverted business opportunities to themselves and Wellspring while they were still employment by Advantage, and the Baileys and Wellspring all knowingly benefited from this unfair competition.

76.

Indeed, at a minimum, by virtue of Mrs. Bailey's officer status in the competing entity, Wellspring is aware of, encouraged, and/or engaged in the foregoing unfair practices, which has allowed, and continues to allow, Wellspring to profit unjustly and to cause Advantage to suffer damages.

77.

The Baileys' and Wellspring's conduct described above and throughout this Complaint constitutes unfair trade practices under LUTPA and has caused Advantage to suffer past and future losses. Such conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious.

78.

Notice of this Complaint will be sent to the Attorney General pursuant to La. R.S. §51:1409(B) immediately upon filing.

79.

Therefore, Advantage is entitled to treble damages under La. R.S. §51:1409 for any continued violations of LUTPA, as well as attorneys' fees.

**COUNT FOUR**
***Tortious Interference with Business Relations***
**(Against the Baileys and Wellspring)**

80.

Advantage incorporates herein by reference the previous allegations.

81.

Advantage had beneficial business relationships with its customers for which it entrusted the Baileys, in part, to service and maintain.

82.

Advantage has a high retention rate for its customers such that it is reasonable to expect its business relationships with them to continue, to grow, and to prosper for years in the absence of wrongful conduct designed to disrupt them.

#104014311v1

83.

The Baileys and Wellspring knew about Advantage's beneficial business relationships with its customers, including those whom Advantage entrusted the Baileys to service on its behalf. Many (if not all) of the customers the Baileys serviced on behalf of Advantage had longstanding business relationships with Advantage, and those customers gave no indication that they wished to discontinue their work with Advantage.

84.

The Baileys tortiously interfered with Advantage's business relationships with malice, doing so by concealing and misdirecting Advantage about their true plans to compete against it; by misusing Advantage's confidential information for their own and Wellspring's benefit to divert Advantage's business relationships; and by unfairly and actively working to divert and solicit Advantages business relationships with clients before their separations from Advantage when they still owed Advantage duties of loyalty.

85.

Wellspring knowingly benefited from and encouraged the foregoing unlawful conduct.

86.

As a result of the Baileys' and Wellspring's malicious interference with Advantage's business relationships, Advantage has lost customers whose business it otherwise would have reasonably expected to retain but for the wrongful conduct alleged herein, thereby causing Advantage to suffer past and future losses.

#104014311v1

## COUNT FIVE
### *Violation of Computer Fraud and Abuse Act*
### (Against the Baileys)

87.

Advantage incorporates herein by reference the previous allegations.

88.

In the days, weeks, and months both before and after their unexpected departures, the Baileys accessed, transferred, and/or misused proprietary information on Advantage's network of electronically stored data.

89.

Neither Mr. Bailey nor Mrs. Bailey were authorized, during their employment with Advantage, to access and obtain this electronic information in order to retain it, disclose it, transfer it, and/or otherwise use it in competition against Advantage.

90.

And, of course, neither Mr. Bailey nor Mrs. Bailey were authorized, after their separation, to access and obtain this electronic information for any purpose, much less to use it in competition against Advantage.

91.

By improperly accessing and/or transferring electronically-stored information housed in Advantage's computing network, and, in some instances, by improperly deleting data, the Baileys knowingly, and with intent to harm Advantage, accessed Advantage's protected computer system without authorization and/or in excess of authorized access.

92.

Advantage incurred, and continues to incur, significant expenses in discovering and

28

protecting the information improperly obtained, which have already exceeded $5,000.

93.

Advantage is thus entitled to all relief available under the CFAA.

## **COUNT SIX**
### *Conversion*
### **(Against All Defendants)**

94.

Advantage incorporates herein by reference the previous allegations.

95.

The Baileys knowingly accessed Advantage's email accounts and used the confidential information stored therein without Advantage's authorization, knowledge, or consent, and, in doing so, they violated their Employment Agreements (described more fully above) and their statutory and/or common law duties.

96.

Upon information and belief, the Baileys transferred this confidential information to Wellspring, and copied and/or inputted it into documents that they have created and/or used while working on behalf of Wellspring.

97.

The Baileys and Wellspring improperly used and/or are using the confidential information they misappropriated to compete against Advantage.

98.

Advantage seeks damages from the Baileys and Wellspring for their unlawful acquisition, possession, and refusal to return the confidential information that they improperly accessed, retained, and/or used following their resignations from Advantage.

#104014311v1

## COUNT SEVEN
### *Unjust Enrichment*
### (Against All Defendants)

99.

Advantage incorporates herein by reference the previous allegations.

100.

The Baileys accessed, downloaded, uploaded, retained, disclosed, and/or transmitted Advantage's confidential information without authorization and/or in a manner that exceeded authorization in direct violation of their confidentiality obligations and Advantage's policies and for the personal benefit of securing Advantage's customer base, pricing, and patient information.

101.

The Baileys, and, in turn, Wellspring, benefited and profited directly from their conspiracy to misappropriate Advantage's confidential information.

102.

The Baileys also actively diverted business opportunities away from Advantage and steered them to themselves and Wellspring while they were still employed by, and/or owed duties of loyalty to, Advantage. Wellspring knowingly benefited from this misconduct.

103.

It would be unfair to allow the Baileys and Wellspring, as their new employer, to retain the enrichment they have unjustly received, and Advantage would be harmed if the Baileys and Wellspring were not required to pay Advantage damages for the wrongful possession and use of Advantage's confidential information, as well as the wrongful opportunities they poached from Advantage, all of which also gave Wellspring and the Baileys and unfair head start in competing against Advantage.

30

## COUNT EIGHT
### *Conspiracy*
### (Against All Defendants)

104.

Advantage incorporates herein by reference the previous allegations.

105.

The Baileys accessed, downloaded, uploaded, disclosed, retained, and/or transmitted Advantage's confidential information without authorization and/or in a manner that exceeded authorization in direct violation of their confidentiality obligations and Advantage's policies with the specific and malicious intent to unfairly establish a competing wound care division at Wellspring and to poach Advantage's customer base.

106.

The Baileys misappropriated Advantage's business strategies, pricing information, and knowledge of its customers' needs to unlawfully compete against Advantage as employees and/or officers of Wellspring, which is Advantage's new direct competitor.

107.

The Baileys concealed their plans to compete and surreptitiously, knowingly, and in bad faith agreed and worked together to divert business opportunities away from Advantage—with staggering success that would otherwise have been unattainable—while they were still employed by Advantage, at which time they still owed Advantage common law and contractual duties that prevented such underhanded conduct.

108.

Wellspring not only allowed itself to knowingly profit from the Baileys' unlawful and deceptive trade practices set forth above, but it also aided, abetted, and encouraged the Baileys'

31

unlawful competition with the specific intent of harming Advantage and depriving Advantage of its customers and competitive advantage.

109.

Thus, Wellspring and the Baileys conspired to commit the unlawful acts described throughout this Complaint to unlawfully compete against Advantage and transfer Advantage's business and goodwill to Wellspring. The Baileys and Wellspring are therefore liable for conspiracy to intentionally and unlawfully harm Advantage.

110.

Pursuant to La. Civ. Code art. 2324(A), Mr. Bailey, Mrs. Bailey and Wellspring are solidarily liable for all damages caused by these intentional and willful acts.

## **JURY DEMAND**

Advantage demands a jury on all claims to which it is entitled.

## **RELIEF SOUGHT**

Advantage requests a judgment in its favor, and against the Baileys and Wellspring, awarding damages, injunctive relief—to prevent the further misuse and disclosure of its protected information—and all other relief to which Advantage is entitled in law and equity, including, but not limited to attorneys' fees and penalties, whether provided by contract, common law, or statute.

Respectfully submitted,

*/s/  Joseph F. Lavigne*
Joseph F. Lavigne (La. Bar #28119)
Michael A. Foley (La. Bar #35774)
JONES WALKER LLP
201 St. Charles Avenue, 47th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8610
Fax: (504) 589-8610
jlavigne@joneswalker.com

32

#104014311v1

mfoley@joneswalker.com
***Attorneys for Plaintiff, Robert Marriott Medical Corp. d/b/a Advantage Wound Care, Inc.***

#104014311v1